### TOWNSEND v. PERRY et al.

(Supreme Court, Appellate Division, Fourth Department. July 11, 1911.)

1. SPECIFIC PERFORMANCE (§ 121*)—CONTRACT TO DEVISE—EVIDENCE.

A contract of persons taking a child to live with them that on their death he should have all their property, if they had no children, otherwise an equal share with their children, if founded on parol, must in an action for specific performance be established by the clearest and most convincing evidence.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 387–395; Dec. Dig. § 121.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. Specific Performance (§ 121*)—Contract to Devise—Evidence.

   Evidence in an action for specific performance of a written contract, purporting to be 50 years old, whereby persons taking a child to live with them agreed that on their death he should have all their property, if they had no children, otherwise an equal share with their children, *held* insufficient to establish its genuineness.

   [Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§. 387–395; Dec. Dig. § 121.*]

3. Evidence (§ 313*)—Declarations—Weight.

   Evidence of declarations made many years before is very unsatisfactory, especially where the declarants are deceased.

   [Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1166–1167; Dec. Dig. § 313.*]

   Spring and Williams, JJ., dissenting.

Appeal from Equity Term, Yates County.

Action by Frank B. Townsend against Ezekiel C. Perry and others. From a judgment for plaintiff (124 N. Y. Supp. 143), decreeing the specific performance of a contract, defendants appeal. Reversed, and new trial granted.

See, also, 142 App. Div. 910, 126 N. Y. Supp. 1148.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

M. A. Leary, for appellants.
James O. Sebring, for respondent.

KRUSE, J. This suit is based upon the claim that the property in question belongs to the plaintiff under a contract made by his mother with Cyrenius C. Townsend and Mary J. Townsend, his wife (the former owners thereof, now deceased), the nature and character of which will be stated presently. In 1861, when the plaintiff was between three and four years of age, he was taken from the Yates county poorhouse by Cyrenius C. Townsend and Mary J. Townsend, his wife, to their home, brought up by them, and lived with them until he married. After his marriage he and his wife resided for several years upon one of the farms in controversy here. The Townsends have died—the wife in February, 1905, and the husband in March, 1905. It is now claimed that within a short time after the plaintiff was taken by the Townsends an agreement was made between them and the plaintiff's mother that the Townsends should take and receive the plaintiff as their child, and that the mother should surrender and give up all right to the child to the Townsends, and, upon the death of the Townsends, the plaintiff should have all their property, provided they had no children of their own; and, if they did have children, then that he share equally with them. The learned trial judge finds that the contract was made as has been stated, and that it was performed by the plaintiff's mother, as appears by the fifth, sixth, and seventh findings of fact. By the eighth finding of fact he also finds that on the 24th day of January, 1862, an agreement in writing was made between the Townsends and the mother, as follows:

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Agreement made this 24th day of January, 1862, between Cyrenius C. Townsend and Mary J. Townsend, of the Town of Jerusalem, Yate Co., N. Y., partys of the first part, and Harriett Eaves party of the second part in consideration of one dollar, partys of the first part agrees to take Charles Eaves son of Harriett Eaves and give him a good education and at our death he is to have all of our property providing we have no children of our own if we do have children then he shall share equal with them. it is further agreed that Harriett Eaves gives up all claims on her son and will not try to get the boy away.            Cyrenius C. Townsend.

                   "Mary J. Townsend.

                   "Harriett A. Eaves."

[1] If the decision rested upon the oral contract alone, it could not well be claimed that the plaintiff had any grounds for maintaining the action. Such claims, based upon oral agreements, have of late years rarely been sustained in this court or by the Court of Appeals. The Court of Appeals in Hamlin v. Stevens, 177 N. Y. 39, 69 N. E. 118, refused to sustain a claim based upon such an alleged contract, and the rule laid down by Judge Vann in that case has, I think, been uniformly adhered to. Chief Judge Cullen in the recent case of Taylor v. Higgs, 202 N. Y. 65, 95 N. E. 30, after referring with approval to the doctrine of Hamlin v. Stevens, says:

"In Hamlin v. Stevens, 177 N. Y. 39, 47 [69 N. E. 118, 120] Judge Vann, speaking for the court and referring to agreements of the character here sought to be enforced, said: 'Contracts of the character in question have become so frequent of recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them, and in enforcing them, when established, by specific performance. Such contracts are easily fabricated and hard to disprove, because the sole contracting party on one side is always dead when the question arises. * * * Such contracts should be in writing, and the writing should be produced, or, if ever based upon parol evidence, it should be given or corroborated in all substantial particulars by disinterested witnesses.' In Rosseau v. Rouss, 180 N. Y. 116, 120 [72 N. E. 916, 918], the same judge, again speaking for this court, said: 'Thus the evidence relied upon to establish the contract is, first, the testimony of the mother, who tried to swear $100,000 into the pocket of her own child; and, second, the testimony of witnesses who swear to the admissions of a dead man. The former is dangerous, the latter is weak, and neither should be acted upon without great caution. We have repeatedly held that such a contract must not only be certain and definite and founded upon an adequate consideration, but also that it must be established by the clearest and most convincing evidence.' Tested by these rules, it seems to me the plaintiffs did not establish their case."

[2] But it is urged that there was a written contract here, which has been established by the production of the writing and corroborated by declarations made by the Townsends, and surrounding circumstances. I am not convinced, however, that the writing has been established. While the learned trial justice saw and heard the witnesses, and undoubtedly was better able to form a correct opinion as to the credibility of their testimony than are we, the undisputed circumstances are such, as I think, to cast such doubt upon the genuineness of the writing as to leave it unproven, and without it I think the action must fail.

The question as to whether this writing was ever made by the Townsends depends almost entirely upon the opinion of witnesses as to whether the signatures to the writing are genuine; and the evidence is very strong that they are not. The plaintiff's mother, as

well as the Townsends, has died, and no one is produced who ever saw the writing until after the death of the Townsends. Not even the plaintiff knew about it until, as he claims, he found it among some papers after their death, and after he had received legal advice that he would be unable to establish his claim by an oral contract. He claims that he found the paper in the possession of a granddaughter of his mother, that there were two wooden boxes, holding a bushel apiece of old papers, and that he found this paper in an envelope with a pension voucher. The granddaughter says she herself had found it in a tin box; that she burned the other papers, but kept this, because, as she states, "Frank Townsend (the plaintiff) will want to know who is the heir of that property."

The plaintiff undertook to show who drew the paper. A witness was called, who according to his testimony was then about nine years of age. He claims that he was at the Townsends when the plaintiff was there in 1861, and that there were some papers drawn there about six weeks after the plaintiff came there. He names several friends and neighbors of the Townsends who were there—Bert Cowen, the justice of the peace, and his mother, the witness and his mother, and the plaintiff's mother. In response to the question as to whether he knew which person drew the papers, he replied, "I think the woman did it," but he does not state which one. He further stated that the paper was read in his hearing, but that he did not remember the substance of it; that, after it was read, he saw names signed; that his mother and the Townsends sat at a table; that the plaintiff's mother was sitting around there. He further testified that he thought she made her mark to this instrument; but her signature to the paper produced is in excellent handwriting and without any mark. I need not call attention further to his testimony. It is very evident that his recollection is hazy and his testimony of little importance. It is not claimed that any of the persons present was a lawyer, and yet, while seemingly the wording of the writing may be somewhat awkward, it is legally perfect, embodying just enough to make it a binding contract. Whoever drew it could not have done better with the decision of the Court of Appeals before him in the case of Winne v. Winne, 166 N. Y. 263, 59 N. E. 832, 82 Am. St. Rep. 647, rendered some 40 years after the instrument here bears date. The circumstances are such as to invite serious inquiry as to whether the writing here is not a spurious output of some one who had before him that decision, where such a contract as this writing purports to be was upheld.

Furthermore, there is evidence quite convincing to me that the paper upon which the writing was drawn, although old in appearance, was not as old as it looked, and was of a kind not made until some years after the instrument bears date. Another conceded circumstance is the fact that nearly 30 years after the plaintiff went to live with the Townsends, in 1889, when he was living away from them, he brought an action against Cyrenius C. Townsend to recover for services rendered by him after he was 21 years of age, which was settled, and upon that settlement he gave Townsend a general release of all claims against him. It may be that the release would not have

the effect to cancel any contract, such as is claimed here, or to release the Townsends from any claim thereunder; but it is a circumstance which may properly be considered upon the question whether in fact any such arrangement or contract ever existed, as the plaintiff now claims.

[3] It is true that the plaintiff produces witnesses who swear to declarations claimed to have been made by the Townsends, which tend to sustain his claim. But such evidence, at the best, is as a rule not very satisfactory. However sincere and honest they may be, it is a long time for witnesses to carry in their memory conversations in which they had no particular interest; and where, as here, the testimony of the persons who, it is claimed, made the declarations cannot be had, such evidence is still more unsatisfactory. While the plaintiff and his mother seem to have had little to do with each other after he went to live with the Townsends, especially during the later years of her life, yet if this contract was actually made in 1862, as now is claimed by the plaintiff, and was in existence during all these years, it is singular that the plaintiff should never have known about it until after the death of the Townsends and the death of his mother, and that no living witness can be produced who gives credible testimony of the making of this contract.

More might be said upon either side of this controversy, but I will simply say in conclusion that, while it may be that the Townsends ought to have given this property to the plaintiff, I think the evidence has not established that they did so or that the plaintiff has any legal right thereto. As it seems to me, the evidence is so unsatisfactory and lacking in convincing force that it ought not to be held sufficient to establish a transfer of real property.

I think the judgment should be reversed upon the law and the facts, and a new trial ordered.


SPRING, J. (dissenting). Prior to January, 1862, the Townsends took the plaintiff, then known as Charles Eaves, on trial preliminary to an adoption by them. The plaintiff's father had died the year previous, and his mother and four children thereafter were inmates of the Yates County Almshouse, from whence the Townsends removed the plaintiff, a lad then four or five years of age, to their home to become one of their household and family. The plaintiff claims that his mother and the Townsends then entered into the written agreement hereinafter more specifically referred to. From this time on the plaintiff continued to reside with the Townsends, bore the name of Frank Townsend, and was treated and loved as a son by his foster parents. He resided with them until he attained his majority, and then, after marrying their niece, worked on their farms for a considerable time. The Townsends had no children of their own, and both of them frequently acknowledged, claimed, and asserted to their neighbors and acquaintances that the plaintiff was their son; that they had the papers to show for it, and that their property would pass to him upon their death. Mary J. Townsend, the wife, died intestate on February 19, 1905, as did her husband, Cyrenius C., on March 15th

following. Letters of administration of the goods, etc., of the husband were issued by the surrogate of Yates county to John E. Watkins, who took possession of the effects and personal property of the intestate. A contest arose between the heirs of the husband and wife as to the disposition of their property. A conveyance from Cyrenius of the real property owned by him to his wife, dated about March 23, 1890, was discovered, and a judgment in partition was entered thereafter, and on February 20, 1906, adjudging the Perrys, heirs of Mary J. Townsend, and the defendants herein, to be the owners of the real property involved, and they purchased the premises at the partition sale. After this adjudication and the transfer to the Perrys by the referee in the partition action, they sold their interests to several grantees who are defendants in this action, joining in an answer with the Perrys.

Up to the time of this litigation and until September, 1906, the plaintiff herein had no knowledge of the existence of the agreement made by his mother with the Townsends, and had no part in the litigation above mentioned, although he constantly asserted his claim to the property left by his foster parents. Harriet Eaves, the plaintiff's mother, after his adoption intermarried with a man named Perkins, and thereafter there was no communication between the mother and son. She died in 1903, and her personal effects were delivered to her granddaughter, a Mrs. Green, including among them the contract referred to, as she and her husband testified. It was contained in a tin box used by Mrs. Eaves for her papers. Mrs. Green and her husband discovered the contract, and recognized its importance to the plaintiff. They talked of it many times, but did not disclose its existence to plaintiff because of some jealousy they entertained toward him and his family. Cyrenius Townsend made frequent statements that he had the papers to show the plaintiff's adoption by him. After his death the plaintiff was refused permission to examine the papers of the decedent, which were then in possession of Bethel Townsend, a brother of the deceased. In September, 1906, the plaintiff examined his mother's papers at the Green's, finding the agreement in controversy wrapped in a pension voucher as laid away by Mrs. Green. Plaintiff based his cause of action both upon the written contract and upon the oral agreement evidenced by the admissions and declarations of Mr. and Mrs. Townsend.

I will briefly summarize the direct proof presented by the plaintiff bearing upon the genuineness of this document. The Greens, husband and wife, who, while not cultured and not in affluent circumstances, yet so far as the record shows respectable and entitled to credit, testified to the finding of this document among the papers of the plaintiff's mother, and their narration seems to be consistent and reasonable. They also testified that the instrument had been in their possession for three or four years when delivered to the plaintiff.

A man named Eldred, about 60 years of age, testified that when from 9 to 12 years of age he lived in the family of the Townsends, and that at one time Bert Cowen and wife, who were neighbors and friends of the Townsends, and Cowen was a justice of the peace, were

at the Townsend household, and Mrs. Eaves was also present and El-dred's mother. He stated that some writing was done at that time as he thought by Mrs. Cowen, and continued his narration as follows:

"Q. You do not know which person drew the papers, which person wrote out the papers? A. I think the woman did it. Q. Did you read the paper, or was it read in your presence? A. It was read in my hearing. Q. Do you remember the substance of it? A. No; I don't know as I do. Q. After it was read, did you see any signing of names? A. Yes, sir. My mother sat at the table and Mr. and Mrs. Townsend. Mrs. Eaves, plaintiff's mother, was sitting around there."

He afterwards testified that he thought Mrs. Eaves made her mark to this instrument.

There is considerable other testimony indirectly tending to confirm the genuineness of the document. Five witnesses, Davis, Stoddard, Alonzo Conklin, Nathan Conklin, and James Smith, all elderly men and friends of the Townsends, testified to conversations had with Cyrenius, extending over a period of many years and some of them coming down to a period shortly anterior to his death, in which he stated that he had the documents to show that he had adopted the plaintiff and intended that he should be the heir of his property, if he had no children, and equally with his lineal descendants, if any sur-vived him. I will quote from two or three of these witnesses for the purpose of disclosing the general tenor of this testimony.

Davis, who was a man of intelligence and at one time a printer, tes-tified that he was with Townsend in his barn talking about the me-chanical ingenuity of the adopted son, and during this conversation, referring to the plaintiff, Mr. Townsend continued as follows:

" 'He is my boy, and I adopted him and I have got the documents to show for it.' Of course, I had nothing to do with leading on the conversation. He spoke of it voluntarily. It was not any concern of mine, so I didn't say any-thing, but I drawed him on the subject, and he said, 'When I get through, Frank will have what I have got,' and he spoke of it two or three times, and that he had the documents to show that he was his boy."

Mr. Stoddard testified as follows:

"Cyrenius told me a number of times that he had taken him as his son, for his own child, and would not take him under any other circumstances. He said he would not take the boy and bring him up until he was 16 or 17 years old, and have his mother come and take him away when he was old enough to work and earn something, and he had him bound to him so he held him as his own child. I don't know as I heard him say much more than that, that he took him as his own child. He said that at first his mother did not want him to take the boy in that way, and he told her that he would not take him under no consideration without he could have papers drawn up."

Nathan Conklin testified as follows:

"He said he would not take him unless he could have papers drawn up to show that he was his own son, and his mother wouldn't agree to it, and he wouldn't take him unless she agreed to it, and she finally did agree to it after a while, and they had the papers drawn up."

James Smith testified:

"On one occasion he (Cyrenius) spoke about his son Frank, and I says, 'He don't look much like you.' 'Well,' he says, 'there is no reason why he should. I am not his father. He is my adopted son, and I had papers made

out legally, that I wouldn't take him any other way.' Up to that time from the conversation I had, I had understood he was his son."

Some of these conversations were had in the presence of Mrs. Townsend, and she participated in them, fully assenting to all that her husband said.

The deduction from these conversations seems to be inevitable that the Townsends at least believed they had a written instrument which bound Frank to them as their adopted son, and imposed the obligation upon them to treat him as an heir in the disposition of their property. It cannot be possible that these people were stating this fact so frequently to their neighbors unless there was some foundation for it, or that these neighbors, intelligent people and intimate acquaintances of the Townsends, invented the story.

The suggestion is pertinent, although there is not any direct evidence to sustain it, that this document was probably written in duplicate, and one copy delivered to Mrs. Eaves and the other retained by the Townsends, and it may have been lost, and it is intimated that, when the papers of the decedent came into the possession of the relatives or administrator of Townsend, it might have been destroyed. In the comparison of handwritings, the plaintiff pretty generally confined the purported signatures of the Townsends to the contract in controversy with what is known as No. 2 on Exhibit 3, which is a photograph containing several of the Townsend signatures. No. 2 purports to be a part of a promissory note, containing the words "With use," and the signatures of Mr. and Mrs. Townsend. The plaintiff claims that he obtained it in its mutilated condition from Mr. Watkins, the administrator of Mr. Townsend. Mr. Watkins confirms this, stating that he transferred all the papers in his custody after his discharge as administrator to the plaintiff, and his recollection seems to be quite distinct that this was included in the list. It is claimed on behalf of the defendant that these signatures and the words, "With use," are all forgeries, and prepared for the occasion, and that they were written by the same person who prepared the contract in suit, including the signatures appended to that instrument.

There was also considerable direct proof as to the genuineness of the signatures of the Townsends to this contract—Plaisted, Neilson (who is the cashier of the bank at Penn Yan and often saw the signature of Mr. Townsend), Hoyt, Davis, and others. Townsend's genuine signature was quite readily obtained as he often gave checks, signed instruments, deeds, and other papers, and these men testified from their knowledge and acquaintance with his signature. On the part of the defendant the testimony impeaching the genuineness of the signatures to the agreement is that of three experts—Hamilton, Truesdale, and Amsden. They are all competent men, and testified with great particularity and analytical acuteness as to these signatures and the documents generally, and they unite in their testimony that the whole business is a forgery, as well as the mutilated paper already referred to. Their excursions into the realm of speculation are not confined to the declaration that the entire contract and the signatures thereto are in one person's handwriting, but one of them seriously

asserted that that person was a woman, which, as the trial justice aptly remarks, "goes even further than an ordinarily zealous expert." An analysis of the testimony of these experts is not necessary. It is sufficient to say that they testified without deviation that the signatures to the contract are forgeries, and their testimony was not shaken materially by the cross-examination. Their credibility, when considered in conjunction with the testimony on behalf of the plaintiff, a part of which has already been adverted to, has been weighed carefully by the trial justice, and he has seen fit to give credence to the plaintiff's witnesses, and finds that the documents are genuine.

I think the rule is ordinarily a wholesome one to apply that the testimony of unprejudiced, intelligent witnesses, who have known the handwriting of the person, the genuineness of whose handwriting is assailed, is entitled to more weight than that of an expert who has never seen the man or his handwriting. Again, the defendant produced an expert of ability and long experience in the manufacture of papers, a Mr. Cossum, who testified that the contract produced was only four or five years of age, and among its ingredients was wood pulp which did not come into use as a constituent of paper until 1876. The handwriting experts on behalf of the defendant, or some of them at least, corroborated Mr. Cossum as to the age of this document. On behalf of the plaintiff, Mr. Davis and one or two other witnesses testified that the kind of paper on which the agreement was written was in use in 1862, and before that, and that it was made of straw pulp instead of wood pulp, so that there was a question of fact upon that proposition. It may be that this paper was a forgery and skillfully prepared to enable the plaintiff to hold this property. It seems to me, however, that too many people must necessarily be implicated in the crime to justify reaching that conclusion, unless there are more circumstances in support of it than appear in this case. We must find that the plaintiff, the two Greens, and Eldred have deliberately testified falsely concerning the document in question if we are to reverse the finding of the trial judge that it was what it purported to be, and Watkins joined in the conspiracy in standing sponsor for the integrity of the mutilated paper which he testified he delivered to the plaintiff. And yet this testimony is all in harmony with that given by many witnesses of the declarations of the Townsends as to the existence of such an agreement.

There is a large amount of testimony in the case, and which is undisputed, tending to show the love and affection of the Townsends for the plaintiff and their intention that he was to participate in their property the same as if their lineal descendant. The proof on this subject is overwhelming, given by disinterested witnesses, is of strong probative force, and upon the strength of it the court below has found that there was an oral agreement of the effect mentioned. The evidence amply justifies this finding of fact. However, the Court of Appeals and this court have so frequently declined to give effect to contracts of this kind that we may not feel inclined to support the judgment on this finding of fact. The oral agreement between the Townsends and Mrs. Eaves was established wholly by the testimony

of disinterested witnesses, and in that respect differs from any of the cases impugning the integrity of contracts of this sort.

The evidence shows one interruption in the friendly relations between the Townsends and the plaintiff. In 1889 he was living apart from them, and brought an action against Mr. Townsend to recover for his services after he was 21. This action was settled, but it naturally produced some ill feeling on the part of the Townsends. It is obvious, however, that this sore spot was healed over for the admissions and declarations of the Townsends in regard to the written agreement and as to their purpose to give the plaintiff their property continued down to a short time before they died, and they visited back and forth during all that time. Upon the adjustment of that litigation, the plaintiff executed a release, general in its terms, to Townsend, and it is claimed that the effect of the release is to cut off the claim in suit. It is quite clear, it seems to me, that it was not expected to include within the scope of the release the present cause of action. It had not then ripened and was not to be effective until the death of Townsend and his wife. The plaintiff knew nothing of his present claim at that time, and there is nothing to indicate that Townsend intended to annul it by that instrument, and his subsequent declarations and admissions concerning his relations to the adopted son and to the effect that his property was to pass to him in case he survived his foster parents are incompatible with any such purpose in the making and execution of the release.

The case was tried at great length and before a careful, discriminating judge, and he had the opportunity to observe these many witnesses and their conduct upon the stand, and has determined the pivotal question of fact in favor of the plaintiff, and we should give the case much consideration before we disagree with his findings.

The judgment should be affirmed.

WILLIAMS, J., concurring in dissent.