FRANK B. TOWNSEND, Respondent, v. EZEKIEL C. PERRY and Others, Appellants.

Fourth Department, March 14, 1917.

**Decedent's estate — agreement to leave property to adopted son after death — evidence insufficient.**

Action to recover certain real and personal property of which a man and his wife or either of them died seized and possessed under an alleged contract between the decedents and plaintiff's mother, made in 1862, whereby plaintiff, then about four years of age, was taken from an orphan asylum and adopted by the decedents who were childless, they in turn agreeing in consideration of the relinquishment by plaintiff's mother of all claim to plaintiff that the latter should, upon their decease, inherit all their property and estate if they died without other children, and that if lineal descendants should survive them then plaintiff should share equally therein with such descendants.

*Held,* on all the evidence, that the alleged contract which the plaintiff asserts he found, and upon which he has relied in two previous trials, and upon which he must still rely in order to establish his claim, is a fabrication and a forgery and at all times known by the plaintiff to be such;

That the plaintiff having been afforded every reasonable opportunity to establish his right to the property, the complaint should be dismissed upon the merits.

Testimony relating to conversational statements casually made many years ago relating to a subject of no personal concern to the witnesses is entitled to slight consideration in such an action.

APPEAL by the defendants, Ezekiel C. Perry and others, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Yates on the 20th day of March, 1916, upon the decision of the court, certain questions having been submitted to the jury.

The judgment decreed that plaintiff owned all of the property and estate, real and personal, of which Cyrenius C. Townsend and Mary J. Townsend, or either of them, died seized and possessed, and canceled all deeds of conveyance and other evidences of title held by the defendants, or any of them, under which the defendants claimed any title or interest in or to said property, and directed the immediate surrender to plaintiff by the defendants of possession of said property. It further appointed a referee to take proofs, state and determine as to the rents, issues and profits of said real estate since the deaths of said Townsends, and to ascertain and determine the amount chargeable to said defendants, or any of them, for cutting and removing any timber from said real estate, and as to the commission of any waste or injury to said lands, and further to ascertain and determine as to what, if any, personal property the said Townsends, or either of them, died possessed and owning, the disposition thereof and the amounts thereof chargeable to said defendants, or either of them.

*Fred A. Robbins* [*Robbins, McLean & Duffy,* attorneys], for the appellants.

*James O. Sebring,* for the respondent.

MERRELL, J.:

The litigation involved upon this appeal, its history, course, attendant circumstances and events, affords, I believe, one of the most remarkable chapters in legal controversy to which the attention of the courts of our State has been directed.

The action is brought to recover certain real and personal

property of which one Cyrenius C. Townsend and Mary J. Townsend, his wife, of the town of Jerusalem, Yates county, N. Y., or either of them, died seized and possessed, under a claim of ownership thereof asserted by plaintiff under an alleged contract between the Townsends and plaintiff's mother, made in 1862, whereby plaintiff was adopted by the Townsends, they in turn agreeing, in consideration of the relinquishment by plaintiff's mother of all claim to plaintiff, that the latter should, upon their decease, inherit all their property and estate, if they died without other children, and that if lineal descendants should survive them, then plaintiff should share equally therein with such descendants.

Cyrenius C. Townsend was a farmer, and resided with his wife, Mary J. Townsend, in the town of Jerusalem, Yates county, N. Y. They were childless, and in the fall of 1861 plaintiff was taken from the county almshouse of Yates county to the home of the Townsends, where he thereafter, for many years, remained a member of their family. Plaintiff, at the time of taking up his residence with the Townsends, was a lad of about four years of age. He was the son of James and Harriet Eaves, and had theretofore borne the name of Charles Eaves. He was born January 15, 1858. His father died in 1861, and shortly thereafter his mother, with several small children, including plaintiff, became inmates of the county home. Plaintiff was taken from the county home by the county physician in charge to the farm of the Townsends, known as the West Hill farm, and was there brought up and received such education as was afforded by the rural school in the district in which they resided. At the age of seventeen years he left school, but remained with the Townsends until attaining his majority, being treated and apparently regarded by them as their own child. Plaintiff married about the time of reaching twenty-one years of age. About this time Cyrenius C. Townsend purchased another farm, known as the East Hill farm, in said town of Jerusalem, consisting of 136 acres. For eight years, from 1879 to 1887, plaintiff lived upon and managed the West Hill farm, which had been his home from early boyhood, the Townsends living upon the new farm. In 1888

the Townsends moved to the village of Penn Yan, plaintiff moving to and working the new or East Hill farm during that year. Up to this time the relations of plaintiff and the Townsends seem to have been entirely harmonious. In the spring of 1889 plaintiff gave up the farm and moved to Penn Yan. At about this time plaintiff and Cyrenius C. Townsend quarreled, and plaintiff brought an action against Townsend in the Supreme Court to recover for services performed after reaching twenty-one years of age. The action was compromised, Townsend paying plaintiff $370 in settlement, the latter executing a general release. From that time forward the evidence discloses very little, if any, personal contact between plaintiff and the Townsends. Three or four years after their disagreement, the Townsends moved back upon the East Hill farm, where they continued to pass the remainder of their days. Plaintiff has since resided at Penn Yan, except for about four years, when he lived at Geneva, N. Y.

Mary J. Townsend died on or about February 9, 1905, of the age of seventy-four years, and her husband, Cyrenius C. Townsend, died on or about March 15, 1905, of the age of eighty-four years. Both died intestate. Subsequent to the death of Cyrenius C. Townsend a deed was discovered, executed by Townsend to his wife, conveying to her all of his real property, consisting of the two farms and his dwelling in Penn Yan. This deed had never been recorded. Litigation then ensued between the heirs of Cyrenius C. Townsend and those of his wife to determine title to said real estate, the former claiming that the alleged deed which had been found was without consideration and was never in fact delivered. This litigation resulted favorably to the heirs of Mary J. Townsend, the court, by judgment granted February 20, 1906, decreeing that by such deed Cyrenius C. Townsend was divested of all title to said real estate, and that thereunder Mary J. Townsend became the sole owner thereof, and so remained until her death. A sale of the premises was decreed and thereon, on April 7, 1906, the property was sold and was bid in by the heirs of Mary J. Townsend. They, with others who have since acquired title to portions of said real property, constitute the parties defendant herein.

Plaintiff first brought an action in May, 1905, to establish his right to the property in question as heir at law of Cyrenius C. Townsend, by virtue of adoption. This action was never prosecuted, and was finally, in 1909, discontinued, and this action commenced.

Soon after the death of Cyrenius C. Townsend plaintiff sought the advice of an attorney as to his right to the property of said decedent, and was advised that he had no right thereto, because there was no contract in existence between the Townsends and his mother. At that time plaintiff had no knowledge of the contract which he later claims to have found. The alleged written contract upon which plaintiff relies, he claims to have discovered in September, 1906, among some old papers of his mother at the home of a niece, a daughter of one Thomas Goundry, plaintiff's brother. The trial here under review was the third trial of this action. Upon the first and second trials the genuineness of this instrument was the main question litigated. Upon this trial that issue was again raised, but plaintiff attempted to fortify himself by the presentation of alleged newly-discovered evidence of the existence at one time of a supposed duplicate thereof, and now insists that his cause of action is established regardless of the genuineness of the instrument upon which he has heretofore relied. For reasons presently to be stated, I think plaintiff must stand or fall upon this instrument, Exhibit 1. The alleged contract is as follows:

" Agreement made this 24th day of January, 1862, between Cyrenius Townsend and Mary J. Townsend of the town of Jerusalem, Yates Co., N. Y. partys of the first part and Harriett Eaves party of the second part, in consideration of one dollar partys of the first part agrees to take Charles Eaves son of Harriett Eaves and give him a good education and at our death he is to have all of our property providing we have no children of our own if we do have children then he shall share equal with them.

" it is further agreed that Harriett Eaves gives up all claims on her son and will not try to get the boy away.

　　　　　　" CYRENIUS C. TOWNSEND
　　　　　　" MARY J. TOWNSEND
　　　　　　" HARRIETT A. EAVES."

It will be useful at this time to briefly state the history of this litigation. This action was commenced September 27, 1909. Issue was joined on October 12, 1909. The action was first tried at the May, 1910, Equity Term held in Yates county, and a decision rendered thereat in favor of plaintiff, and judgment thereon entered July 19, 1910. Appeal therefrom was taken to this appellate court, and the judgment of the Equity Term was, by a divided court, reversed and a new trial granted. (*Townsend* v. *Perry*, 146 App. Div. 225.)

Upon that appeal this court held, our present presiding justice delivering the prevailing opinion, that plaintiff had failed to establish the genuineness of the disputed writing, and that the testimony was insufficient to support an oral contract between plaintiff's mother and the Townsends, under which plaintiff could recover, citing *Hamlin* v. *Stevens* (177 N. Y. 39); *Taylor* v. *Higgs* (202 id. 65), and *Rosseau* v. *Rouss* (180 id. 116).

Upon this first trial an effort was made to sustain plaintiff's claim and to corroborate the execution of the disputed writing through the testimony of a large number of witnesses who testified to declarations claimed to have been made by the Townsends in harmony with the alleged contract. This court, under the decisions cited, correctly held that the proofs of such alleged declarations fell short of satisfying the rigid requirements of law to establish plaintiff's claim.

The action was tried a second time at the Yates County Equity Term in October, 1911. Upon this trial the alleged written contract was again presented as the basis of plaintiff's claim. A large amount of testimony was presented touching upon the genuineness of the instrument, and a still greater number of witnesses were produced by plaintiff, who testified to alleged declarations of the Townsends tending to support the pretended writing. These alleged declarations, while greater in volume, did not differ essentially from those offered upon the first trial, and which this court held to be insufficient to establish plaintiff's claim. This trial resulted in a decision in favor of the defendants. The learned justice who presided at the trial held that plaintiff must stand or fall upon the alleged written contract, and that said contract was not signed by either of the Townsends. Judgment was awarded dismissing

plaintiff's complaint upon the merits. From that judgment plaintiff appealed to this Appellate Division, and in July, 1913, the said judgment was here unanimously affirmed. (*Townsend* v. *Perry,* 158 App. Div. 889.)

On March 14, 1914, plaintiff applied for and was granted a new trial on newly-discovered evidence. An appeal was taken to this court, and the order granting a new trial was reversed and the case remitted to Special Term for reconsideration. (*Townsend* v. *Perry,* 164 App. Div. 963.)

Subsequently and on November 14, 1914, another order was granted at Special Term on plaintiff's application granting a new trial on newly-discovered evidence. An appeal was taken therefrom to this court, where, at our July, 1915, term, the order granting a new trial was modified by requiring as a condition thereof the payment by plaintiff of all costs to date, and as so modified was affirmed. (*Townsend* v. *Perry,* 170 App. Div. 932.)

Plaintiff paid the costs thus imposed.

On October 23, 1915, at Special Term, an order was granted directing the trial of an issue of fact by a jury, said issue of fact being therein stated as follows: "Did Harriett E. Eaves, the mother of the plaintiff, and Cyrenius C. Townsend and Mary J. Townsend, on or about the 24th day of January, 1862, make a written contract or agreement, in and by which it was in substance agreed that the said Townsends would take the plaintiff and treat him as their own son, and upon the deaths of the said Townsends that he should become the owner of the property of which the said Townsends, or either of them, should die the owner of, provided said Townsends died without children living, and if so, that he should share with the said children ?"

This order was affirmed by this court January 22, 1916 (172 App. Div. 942), and the issues of fact thereunder were thereafter tried and a verdict rendered by the jury answering the question propounded in the affirmative. The court rendered its decision thereon and judgment was entered in Yates county clerk's office March 20, 1916, for the relief prayed for in plaintiff's complaint. From such judgment defendants have brought this appeal.

We, therefore, now address ourselves to the determination of the question whether the evidence presented upon this last

trial is such as to justify the verdict of the jury and the judgment entered thereon.

If the evidence upon the third trial were the same as that presented at the two previous trials, we would doubtless adhere, as a matter of course, to our former decisions and reverse the judgment appealed from and dismiss plaintiff's complaint. But plaintiff claims upon the trial here under review to have presented newly-discovered evidence which should overcome the criticisms of this court as to the insufficiency of the plaintiff's evidence upon the previous trials.

As before stated, upon both of the previous trials plaintiff based his right of recovery upon the alleged written agreement, and devoted his chief efforts to proving the genuineness of the signatures to that instrument. Upon the last trial plaintiff seems practically to have abandoned all attempt to establish the genuineness of that instrument. The question submitted to the jury did not, in terms, involve it, and they were not instructed that they must find the paper genuine, if plaintiff was to succeed. The plaintiff claims that even though the genuineness of this paper be questionable, his newly-discovered evidence establishes the existence of a written contract similar in its provisions to that presented. It seems clear that plaintiff must recover, if at all, upon the strength of the alleged writing, Exhibit 1. By its verdict the jury found that on or about January 24, 1862, the Townsends and plaintiff's mother made the written agreement referred to in the question submitted. The question which the jury, by their verdict, answered contained no allusion to the alleged agreement of plaintiff's mother which formed the consideration of the agreement, to wit: That the mother would "give up all claims on her son and will not try to get the boy away." Notwithstanding this omission from the jury's finding, the court found such agreement on the mother's part. No basis for such finding can be discovered aside from the provisions of Exhibit 1.

The testimony given upon this trial of an alleged duplicate of Exhibit 1, as to its contents, and to which attention will hereafter be more particularly called, is so unsatisfactory and unconvincing as to make it at most merely corroborative of the genuineness of the paper produced.

Under all the evidence before us, we have no hesitation in expressing our conviction that the paper writing which plaintiff asserts he found and upon which he has hitherto relied and upon which he must still, we think, rely, is in its entirety a fabrication and a forgery, and at all times known by its sponsor to be such. Not alone does the great preponderance of the expert testimony offered upon the trial establish the spuriousness of the instrument, but a mere comparison of the signatures upon the instrument with the genuine signatures of Cyrenius C. Townsend, his wife and of plaintiff's mother clearly demonstrate, even to the layman, that the former are but clumsy forgeries. It will be unnecessary to repeat what has heretofore been written with reference to plaintiff's failure to establish the genuineness of this instrument.

An examination of the record on this appeal reveals no reason for revising the opinion of this court expressed upon the former appeals as to the spuriousness of the alleged written contract. Upon this appeal plaintiff's counsel seeks to minimize the importance of Exhibit 1, and asks an affirmance of the judgment, although it appears that the signatures to the writing offered were not genuine. We are unable lightly to put aside this document upon which plaintiff has hitherto so persistently relied. If it is the forgery that we believe it to be, it must ever be an insurmountable obstacle in plaintiff's pathway, always raising its sinister shape to confound him in his efforts to establish his claim to this estate. He vouched for it upon the former trials, and now that the courts have branded it as a fraud, its sponsor cannot escape the consequences.

In view of what has been heretofore written, it will not be necessary to here make more than passing reference to the many circumstances which we think strongly tend to disprove the contract claimed by plaintiff. Cyrenius C. Townsend, at the time of this pretended contract, was a well-to-do farmer of forty-one years of age. His wife was of the age of thirty-one years. In the natural course of human events they were not beyond the expectation of children of their own. But we are asked to believe that this couple took a child four years of age of whose antecedents they could have had no knowledge, and, after an acquaintance of six weeks, agreed to bestow upon him

all property of which they might die seized or possessed, unless
they should have children of their own, in which event he should
share equally with such children.   With no possible knowledge
of his future, whether he might prove worthy of their beneficence
or not, whatever might be the trend of his character or how
undeserving he might become, in consideration of his release
by his overburdened mother, herself, with her brood of father-
less children, the recipient of public charity in the county
almshouse, they bound themselves unalterably, not only to
take the boy to their comfortable home, raise him and give
him a good education, but at their death to give him all their
property, or at least that he should share equally with their
children.   Their children they might disinherit, but not so
the plaintiff, if this contract was made.   His legal adoption
would give him no such rights as Exhibit 1 purports to bestow.
It requires a stretch of credulity beyond us to believe that such
an unreasonable contract was made.   The circumstances sur-
rounding the alleged discovery of Exhibit 1 are suspicious.
Plaintiff does not pretend that he ever, during the lifetime of
the Townsends, had any knowledge or intimation of its exist-
ence.   Indeed, he admitted upon the trial that after the
death of the Townsends and when he was consulting a lawyer
with reference to asserting a claim upon their estate by virtue
of his adoption, and when advised that he could not succeed in
the absence of a written agreement on their part with his
mother, he told his counsel that there was no such writing.
Later he employed other counsel and admits that a clerk in
such new counsel's office read to him certain decisions of the
courts, one of which cases, he admits, " fitted his exactly," and
soon thereafter he " discovered " the writing, Exhibit 1, among
some old papers in the possession of a granddaughter of his
mother.   It is most remarkable that for forty-four years this
important paper, so vital to the interests of plaintiff, should
have been kept concealed from him.   During all this time his
mother, its alleged custodian, resided near plaintiff, and yet no
word came from her.   It is passing strange that his foster
parents, who manifested their self-sacrificing regard for him
by making him the recipient of all the fruits of their labor and
frugality, should have hidden from him during all the long

years of their close family relationship the fact of the existence of this contract. And it is more than strange that during these forty years when it is claimed that the Townsends were repeatedly laying bare their acts to the large number of witnesses who repeat declarations of these people claimed to have been made at the family fireside in the neighborhood to relatives and to strangers, that no note or syllable thereof reached the ear of the one most interested and who was their constant companion.

The suspicion suggests itself that plaintiff's statement to the attorney whom he first consulted that there was no written contract was an unfortunate one. If we are to credit the testimony of plaintiff's witnesses, the Townsends were repeatedly telling neighbors, friends, relatives, and even strangers, of their adoption of plaintiff, and that they had papers to show it. Why did no word of it ever come to plaintiff prior to his "discovery" of Exhibit 1? According to one witness, Townsend, on his death-bed, told the witness about the paper and expressed a desire to see plaintiff. Plaintiff thereafter called upon him twice and was alone with him for hours at a time, but he remained in ignorance of the writing. If it existed why was it withheld from plaintiff? His mother's conduct was no less strange. On this last trial it was claimed that she informed others of it and exhibited it to one witness and read it aloud.

For many years prior to her death she and her son resided in the same village, but she always withheld from him knowledge of the paper upon which his rights depended. It is difficult to explain why she did this if such paper was in existence.

The circumstances, as related by plaintiff, under which he claims to have found the paper writing will bear brief discussion. Upon the first trial (146 App. Div. 225, 228) he claims that he found the paper in the possession of a granddaughter of his mother; that there were two wooden boxes holding a bushel apiece of old papers, and that he found this paper in an envelope with a pension voucher. The granddaughter says she herself had found it in a tin box; that she burned the other papers, but kept this one, because, as she states, "Frank Townsend [the plaintiff] will want to know who is the heir of that property."

On the present trial plaintiff repeated his testimony relative to the finding of the paper among the contents of the two boxes of rubbish, and no explanation is made with reference to the granddaughter's testimony that she had destroyed all save this paper. In an apparent effort to harmonize her story with that of plaintiff, she now testifies that she subsequently took this important paper out of the tin box, where she was keeping it for plaintiff, and put it in a wooden box, because it was a more safe place for it, so it would not get lost. It was so valuable it was placed among an accumulation of old waste papers in a large wooden box. She took no steps apparently to inform plaintiff of her find, and years later, when plaintiff came there in 1906, she assisted in getting the two large wooden boxes, and he was permitted to hunt through one, and finally discovered the valuable instrument in the other box. These were surely strange circumstances under which plaintiff discovered the paper which had been so carefully and for so long saved for him.

As before stated, upon the third trial, as upon both of the preceding ones, plaintiff sought to fortify his position by the testimony of a large number of witnesses who relate conversations with Cyrenius C. Townsend and his wife, particularly the former, wherein declarations were made which are claimed to substantiate the alleged contract. The same witnesses who testified at the former trials testified here, or their former testimony was read in evidence. It will be unnecessary to review in detail such testimony. It will suffice to say that it does not differ in general character from that given upon the first trial and held by this court insufficient to establish plaintiff's claim. An examination of the testimony of this character which was offered by plaintiff reveals its unsatisfactory and unconvincing character. Witnesses who had testified on previous trials and had then avowedly fully and exhaustively related all that they had heard from the lips of the Townsends, on this trial were again produced and showed a most remarkably refreshed recollection of conversations casually heard during a period of over forty years, and on a subject of no possible personal interest, and here testified to alleged declarations of the Townsends more strongly tending to corroborate the existence

of the alleged written contract than anything they had been able to recall upon either of their previous efforts. By repetition here their former testimony loses none of its relevancy, and the fact that in many instances these witnesses are now able to recall more specific declarations of the Townsends; tending more surely to corroborate the alleged written contract cannot but arouse suspicion that their present testimony is largely an afterthought and the fruit of the skillful tutelage of someone aware of the necessities of the situation. As the testimony of this character is presented by the record before us, it does not meet the requirements established by the judicial decisions of our State. Many of the witnesses are not wholly disinterested, their testimony is not without bias, and is unconvincing. They attempt to relate conversational statements casually made long years before anent a subject of no personal concern to them, and their. testimony is entitled to slight consideration. (*Wallace* v. *Wallace*, 158 App. Div. 273; affd., 216 N. Y. 28; *Stillwell* v. *Bateman*, 83 Misc. Rep. 589; affd. on opinion below, 163 App. Div. 964; *Taylor* v. *Higgs*, 202 N. Y. 65; *Rosseau* v. *Rouss*, 180 id. 116; *Tousey* v. *Hastings*, 127 App. Div. 94; affd., 194 N. Y. 79.)

In *Wallace* v. *Wallace* (158 App. Div. 273, 281) the rigid rules adopted by our courts relative to testimony of this character are summarized.

The testimony of new witnesses, who for the first time testify to alleged declarations of the Townsends, is no more satisfactory. It is perhaps not strange that so many witnesses essay to testify as to the alleged declarations. In most instances the witnesses evince a considerable interest in plaintiff's behalf. It is quite likely that the Townsends, prior to their quarrel with plaintiff, entertained an affectionate regard for him and very possibly intended that eventually he would receive their property. Under the circumstances this would be quite natural, and it would be quite as likely that they might express their intentions to neighbors and friends. So there may be some foundation for the declarations which these witnesses narrate. But, so far as proving the existence of any written contract of the character claimed, such testimony is of little evidentiary value.

Upon the first appeal the alleged written contract was justly criticised because no witness was produced who ever saw the writing until after the death of the Townsends. The evidence upon the second trial failed to overcome such criticism. In the dissenting opinion upon the first appeal it was suggested that, while there was no direct evidence to that effect, the document might have been written in duplicate, one copy being delivered to Mrs. Eaves and the other retained by the Townsends, and that the latter duplicate may have been lost. To overcome the criticism of this court and possibly directed by the suggestion in the dissenting opinion above referred to, an attempt is made upon the third trial to prove that the Townsends in their lifetime had in their possession a duplicate of Exhibit 1. The testimony in relation thereto constitutes in greater part the alleged newly-discovered evidence. The new testimony was furnished by four. witnesses, Katie Brown, Charles Conklin, Herbert Robertson and Nancy E. Roberts. Of these the first two had previously testified. The last two were new. The witness Katie Brown was first sworn on the second trial where she testified to two conversations with Mrs. Townsend in the years 1902 and 1904, respectively, in which she claimed Mrs. Townsend told her that they had adopted plaintiff and had papers.' She also testified to alleged conversations with Cyrenius C. Townsend during his last illness, and after the death of his wife, and that on the last day she saw him Townsend said he (plaintiff) was an adopted son of his, and he should have all he had. Counsel for defendant, on cross-examination, interrogated her further and she then testified, " Cyrenius never said he had a contract," and that he had never volunteered or informed her that he had such a contract. On the third trial this witness was again sworn and in once more recounting her last interview with Townsend, gives the amazing testimony that on this occasion, as she was doing some sweeping in decedent's house, Townsend requested her to get a tin box from a clothes room off the sitting room and bring it to him; that when she had complied with his request he opened the box and took something out which witness did not see, and later told witness that there was a paper in that box that he was going to give to Frank. On cross-examina-

tion the witness amplifies this by the further testimony: "He said about the box, he said he had a paper in that box that he was going to give to Frank, there were adoption papers in the box, and he would hold all the property when he was dead." To say the least, it is strange that so important testimony as this was overlooked at the time she was previously called to testify, and when as a witness she seems to have been exhausted. Aside from this her cross-examination is far from reassuring and her prejudice against some of the defendants apparent.

If the testimony of the witness Katie Brown is to be believed it would indicate that the paper was in the tin box when Townsend died. But on the second trial plaintiff had proven by a witness named Heydecker that he looked through Townsend's papers after his death and found no contract. To meet this situation a witness named Charles Conklin was called. Conklin testified on all three trials, and made the principal affidavit upon which this trial was granted. He was a nephew of Cyrenius C. Townsend and a defeated defendant in the action brought by the heirs of Mary J. Townsend against the heirs of Cyrenius C. Townsend. On the first trial Conklin testified to two conversations with Townsend or his wife, one in 1875, when he claims Townsend told him he had adopted plaintiff, and another with Mrs. Townsend in her husband's presence in which she said plaintiff was their boy. Conklin then testified: "There was no other conversation that I recall." On the second trial he testified to still another conversation between Townsend and another nephew in which the former said in reply to the nephew's suggestion that he have the farm when Cyrenius was through with it, "I can't do that, * * * when I am through with it it goes to Frank," and that he and plaintiff's mother had the adoption papers. Conklin's only excuse upon the second trial for not furnishing this important testimony on the previous trial was that he was not asked, although he never forgot it, and was then telling it because he was asked to tell all he knew. Notwithstanding the fact that Conklin had apparently exhausted all pretended knowledge upon the second trial, he appears once more at the third trial and amplifies his previous efforts as a witness in the case by testify-

ing that shortly before the inventory was taken in the Cyrenius C. Townsend estate, he was at the Townsend house in company with a brother of Townsend, who has since died and cannot dispute the witness, and that they got out the tin box and when the papers were half looked over they found the adoption paper. Conklin testifies he read it and attempts to state its contents — how Townsend was to take Frank as his own boy and give him an education and when he was through with it he was to have his property; that the names of Townsend, his wife and Harriett Eaves were on the paper at the bottom; and that the brother took the paper. After this alleged occurrence in 1906 there was the trial of the action between the heirs of Mrs. Townsend and those of Cyrenius, in which Conklin was a defendant, and on which trial he was called to testify. He says that at that time he thought and so stated that this property should go to the C. C. Townsend heirs instead of anybody else. Conklin's excuse for failing then to divulge the facts with reference to the paper to which he now testifies, is that he was then working for the heirs. The entire testimony of the witness Conklin is of such a character as to be unworthy of credence, and is wanting in the essential elements of proof of a contract, or of the genuineness of the signatures which he claims he saw upon the paper. Plaintiff produced one Herbert Robertson as a new witness. This witness in 1889 and 1890 was a tenant upon the East Hill farm of C. C. Townsend. He did not prove satisfactory, and in 1890 Townsend took summary proceedings to evict him. He was not sworn upon either the first or second trial, but was located by plaintiff prior to the third trial conducting a saloon at Newark, N. Y. He testifies that in 1889, when negotiating for the rental of the East Hill farm, he overheard a quarrel between Townsend and plaintiff, who had been working the farm, and that Townsend ordered plaintiff from the house. After plaintiff had left he claims Townsend told him that he was his adopted son and that Townsend then went and got a paper, and wanted him to look at it, and that he saw there were three names signed at the bottom, but could not swear whose names they were; that Townsend was angry and threatened to burn the paper, but that Mrs. Townsend coaxed it away from him; that Townsend said plaintiff would have had all their

property "if he hadn't done as he had done." For obvious reasons plaintiff's position does not receive much support by the testimony of the witness Robertson. Finally plaintiff produces a new witness in the person of Nancy E. Roberts, his cousin. If her testimony could be said to bear the indicia of truth it would play a most important part in settling the rights of these parties. We are unable to accord to it that merit. This cousin of plaintiff testifies as to recollecting the fact of plaintiff's removal from the county house to the Townsend home. She was then thirteen years of age; that in the following spring Harriett Eaves visited the home of witness' mother, and that witness saw her examining papers in the same tin box produced upon the trial, and which witness was able to recognize; that on coming to one paper Mrs. Eaves said, "There is Frank's papers;" that witness saw the paper and heard it read to her mother, and although then a child of thirteen was able upon the trial after a lapse of fifty-three years to identify Exhibit 1 as the paper she then saw; that she remembers the contents of the paper, and states that her memory was refreshed when plaintiff had called at her home in Elmira four weeks before and again the week before the trial. She testified that when plaintiff called he had the contract, Exhibit 1, with him and showed it to her. The fact that Exhibit 1, since the first trial, has been kept continuously in the custody of the Yates county clerk, and only accessible during the actual trials, demonstrates the falsity of the testimony of this witness that plaintiff brought it to her in Elmira. So barefaced was this attempt that the witness finally swore that it was on Monday evening, after the trial had commenced, that she saw Exhibit 1. The events of that occasion fifty-six years before, when she says she saw the paper and heard Mrs. Eaves read it to her mother, were so indelibly impressed upon her mind that she was able to recognize it as Exhibit 1 produced upon the trial by means of little pieces which had been cut from it. The fact that these pieces had been cut from the paper since the first trial in order to discover whether wood-pulp entered into its composition, would seem to render that mark of identification of little importance. In explanation of her withholding from plaintiff the important facts to which she finally testified, witness stated

that she supposed his brother, Thomas Goundry, would tell him, as he had also seen the contract, and that she had on one occasion seen him have it out looking it over just after his mother, Harriett Eaves, died, when he was packing up and when the witness was present. At the time of the third trial Goundry was dead, but he was living and testified for plaintiff upon the first trial and then disclaimed ever having heard the Townsends say anything about papers. As to the paper, Exhibit 1, which the witness Nancy E. Roberts testifies he had and read, Goundry on the first trial gave testimony tending to prove that the signature it bore was that of his mother, but expressly denied ever having seen the paper before. These circumstances lead to the conviction that the testimony of this last witness, like that of the others which we have discussed, was unworthy of belief.

Plaintiff has, we think, signally failed to establish his cause of action. It appears to our satisfaction that no contract was ever made by Cyrenius C. Townsend and Mary J. Townsend or either of them with Harriett Eaves whereby plaintiff is entitled to their property. We are irresistibly borne to the conclusion that the alleged contract was purely fictitious. Every reasonable opportunity has been afforded plaintiff to establish a right to this property and he has failed. No valid reason exists for a continuance of his abortive efforts to establish a contract which never existed.

We are not called upon to award a new trial by reason of any ruling upon the trial prejudicial to respondent. Neither in his brief nor upon the argument was any error suggested or claimed by respondent requiring a new trial and we have discovered none.

We think the judgment should be reversed and that the essential findings of fact made by the learned trial court at Equity Term upon which said judgment was entered be disapproved and that in their place and stead new findings of fact should be made by this court in accordance with the views herein expressed and denying plaintiff the relief sought in his complaint, and that said complaint should be dismissed upon the merits, with costs.

All concurred.

Judgment reversed, with costs, findings of fact and conclusions of law disapproved and new findings and conclusions made in accordance with the opinion and judgment directed for the defendants dismissing the complaint upon the merits, with costs. Order to be settled before MERRELL, J., on two days' notice, at which time findings to be disapproved and new findings to be made may be submitted.